**Below is a Memorandum Decision of the Court.**



**Brian D. Lynch**
**U.S. Bankruptcy Court Judge**
**(Dated as of Entered on Docket date above)**

---

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>VENTURE FINANCIAL GROUP, INC.,<br><br>Debtor. | Case No. 13-46392-BDL |
| MARK D. WALDRON, as Chapter 7 Trustee for Venture Financial Group, Inc.<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Receiver of Venture Bank<br><br>Defendant. | Adversary No. 14-04194-BDL<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This trial was held on July 26, 2016 through July 29, 2016. Plaintiff Mark D. Waldron, as Ch. 7 Trustee of Venture Financial Group, Inc., (the "Trustee") appeared through his counsel, Dillon E. Jackson and Christopher Emch of Foster Pepper PLLC. Defendant, Federal Deposit Insurance Corporation, in its capacity as Receiver of Venture Bank, appeared through its counsel, Teresa H. Pearson of Miller Nash Graham & Dunn LLP (the "FDIC-R").

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

**Below is a Memorandum Decision of the Court.**

## Introduction

Venture Bank is a wholly-owned subsidiary of debtor Venture Financial Group, Inc. ("VFG"). Venture Wealth Management, Inc. ("VWM"), is a subsidiary of Venture Bank. (the "Bank") (collectively herein, VFG, VWM and the Bank are the "Consolidated Group"). In the past, VFG, as the parent corporation of the Bank and VWM, served as sole agent for the Consolidated Group for tax purposes, pursuant to 26 C.F.R. § 1.1502-77. In 2009, the Bank was closed and placed into federal receivership, and the Federal Deposit Insurance Corporation was appointed as receiver. In 2011, the FDIC-R made a request to the Internal Revenue Service (the "IRS") to serve as alternative agent for the Consolidated Group pursuant to 26 C.F.R. § 301.6402-7, which was approved despite VFG's objection. The FDIC-R subsequently filed amended tax returns requesting tax refunds for past tax years based on loss carrybacks arising from the losses incurred mainly by the Bank in 2009. The FDIC-R, as alternative agent for the Consolidated Group, received tax refunds at issue in this case: one in July 2013 in the aggregate amount of $6,204,763.10, and another two in October and November of 2014 in the aggregate amount of $2,267,219.26 (the "Tax Refunds"). On October 10, 2013, the debtor filed a chapter 7 bankruptcy petition.

This dispute concerns the Trustee's actions to avoid both prepetition and postpetition transfers of Tax Refunds to the FDIC-R. Central to both of the Trustee's claims is the question of whether the Tax Refunds are property of the estate under 11 U.S.C. §541. The Postpetition Tax Refunds (defined below) are currently held in a neutral account pending resolution of this case. This Court holds that the Tax Refunds are property of the estate and that the Trustee is entitled to avoid the transfers of the Tax Refunds and may recover them for the benefit of the estate.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2

**Below is a Memorandum Decision of the Court.**

Having heard the testimony of the witnesses, reviewed the evidence submitted and heard the argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law under Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52.[1]

## I. Findings of Fact

### A. The 1993 Tax Allocation Agreement

1. On or about February 12, 1993, First Community Financial Group, Inc., and First Community Bank executed the Tax Allocation Agreement (the "1993 TAA"). Ex. 15[2]; Agreed Facts for Trial ("AFT"), ¶ 3, July 12, 2016, ECF No.101. The 1993 TAA was executed by Ken F. Parsons, who at that time was a President and CEO of First Community Financial Group, and John R. Johnson, who was a President and CEO of First Community Bank. The 1993 TAA was to continue in existence for "all subsequent taxable periods unless the Parent and the subsidiary agrees [sic] to terminate the agreement." *See* Ex. 15, ¶8. The 1993 TAA has been in place at all times since it was signed. First Community Financial Group, Inc. and First Community Bank changed their names to Venture Financial Group and Venture Bank in 2003.

2. In its preliminary recitals, the 1993 TAA states that "it is the intent and desire of the parties hereto that a method be established for allocating consolidated tax liability of the Affiliated Group among its 'members,' for reimbursing the Parent for payment of such tax liability, for compensating any part for use of its losses or tax credits, and to provide for the allocation and payment of any refund arising from a carryback of losses or tax credits from subsequent taxable years." *Id.*

3. Section (2)(a) of the 1993 TAA required each member to compute its own tax liability as if it was filing its own tax return and pay that amount to the parent, now VFG. *Id.*

---

[1]To the extent a Finding of Fact is a Conclusion of Law, or the converse, it is adopted as such.

[2] During the trial, the parties used deposition exhibits ("Ex. 1 – 84") and exhibits introduced by each party ("P-1 through P-26" and "D-1 through D-20"). To avoid confusion, the Court follows the numbering scheme utilized by the parties.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 3

4.     Section 5 of the 1993 TAA gave solely the parent (VFG) the discretion to "determine whether an election shall be made to carry back part or all of a consolidated net operating loss for any taxable year . . . ." *Id.*

5.     Section 6 of the 1993 TAA provided:

> If the consolidated tax liability is adjusted for any taxable period, whether by means of an amended return, claim for refund . . ., the liability of each member shall be recomputed to give effect to such adjustments, and in the case of a refund, the Parent shall make payment to each member for its share of the refund, determined in the same manner as in paragraph 2 above, within five days after the refund is received by the Parent. . . . *Id.*

6.     Section 7 of the 1993 TAA provides that if any party to the agreement acquires or organizes another subsidiary, such as the later formed VWM, it would be bound by the agreement. *Id.*

7.     Section 9 of the TAA provides that it "shall be binding upon and inure to the benefit of any successor, . . . to the same extent as if the successor had been an original party to the agreement." *Id.* at ¶9.

8.     At trial, the Trustee offered testimony of three former officers and directors of VFG and the Bank.  Mr. Parsons, who signed the 1993 TAA as President/CEO of First Community Financial Group, was also Chairman of the Board of First Community Bank, and assumed those same roles with VFG and Venture Bank after the names were changed to those entities.   The Trustee also introduced testimony from Sandra Sager, who was the Chief Financial Officer for both VFG and the Bank, and James Arneson who became President of VFG and a board member and President and Chief Executive Officer of Venture Bank in September 2005.[3]

9.     Both Mr. Parsons and Ms. Sager testified that the 1993 TAA was amended in 2003 to reflect the new names of VFG and the Bank, but that no other substantive changes were made.  Despite extensive efforts on behalf of both of the parties during discovery to locate

---

[3] Mr. Arneson had a previous tenure with the predecessor in interest, serving as the Chief Financial Officer of First Community Bank from 1993-2003.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

an alleged subsequent tax allocation agreement, in either paper or electronic formats, no other agreement was ever found.  Mr. Parsons could not recall ever seeing a subsequent amended tax allocation agreement, and could not recall any specific date such an agreement was executed.  While Ms. Sager testified that she saw a tax allocation agreement with VFG and the Bank's name on it, she could not remember any other details about the alleged second agreement or when she saw it.

10.    However, Mr. Arneson, who was an officer and director of both VFG and the Bank at the relevant times, testified that the 1993 TAA was never amended.  He stated that the 1993 TAA was the tax allocation agreement in effect at all times between VFG and its subsidiaries and neither VFG nor the Bank ever went back to change the names under the 1993 TAA after the holding company and bank changed their names.  Mr. Arneson was not aware of any other agreement and testified that in 2007, when VFG prepared its due diligence for a potential initial public offering and needed to identify any tax allocation agreement, the 1993 TAA was the agreement Mr. Arneson provided to potential investors.  In addition, Mr. Arneson denied that there was ever a separate oral or implied tax allocation agreement. The Court finds that Mr. Arneson's recollection and testimony in this regard were the most accurate and credible.

11.    The FDIC-R concedes in its Trial Brief that "there was no tax allocation agreement other than the First Community TAA." (i.e., the 1993 TAA) (Def.'s Trial Br., 9, July 12, 2016, ECF No. 102).

12.    The FDIC occasionally conducted examinations of the Bank, during which the FDIC would request copies of all policies and agreements, including a tax allocation agreement. *See* Ex. P-15.   The Bank provided a tax allocation agreement during each of these examinations, and the 1993 TAA was the agreement provided.  In addition, the 1993 TAA was provided to the Federal Reserve Board during their examinations of VFG.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 5

13.     The Court finds that the 1993 TAA was the only tax allocation agreement between VFG and the Bank, entered into by their predecessors-in-interest, and the 1993 TAA was still in effect as of the Petition Date, as no steps were taken to terminate the 1993 TAA.  The Consolidated Group was never otherwise disassociated for tax filing purposes, through any other means.  No credible evidence was produced that the 1993 TAA had been superseded or rescinded.

**B.     The Terms of the 1993 TAA Established a Creditor-Debtor Relationship**

14.     The terms of the 1993 TAA are not vague or ambiguous.  The 1993 TAA required VFG to make a payment to the Bank of the Bank's proportionate share of any tax refund received by VFG.

15.     The 1993 TAA does not contain any language giving the subsidiaries control of any tax refunds in the parent's possession.  Nor does it require VFG to segregate any of the funds.

16.     The 1993 TAA contains no language which suggests that VFG was the agent of the Bank, nor did the 1993 TAA give the Bank any control over VFG in the preparing and processing of the consolidated tax returns, or in the processing of tax refunds (except after the FDIC-R requested to become the alternative agent for the Consolidated Group when the Bank was closed, which is discussed further *infra*.) To the contrary, VFG appears to have been in complete control of the preparation and processing of the consolidated tax returns. Furthermore, per Section 5 of the 1993 TAA, VFG appears to have been in complete control over the decision on carrying back net operating losses and, as seen in practice from 2004 to 2007, VFG was in complete control over any decisions to carryforward and apply tax refunds to future tax years.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6

17.     Furthermore, VFG is not prohibited under the 1993 TAA from using taxes paid or tax refunds received as its own or comingling funds paid to it by the Bank or received from the IRS.  The Bank also does not bear the risk of loss under the 1993 TAA.

## C.     The Treatment of Tax Refunds Pre-Receivership

18.     The Bank had positive income on a stand-alone basis before 2008, but losses in 2008 and 2009.  AFT at ¶8.

19.      Each of the tax returns that VFG filed on behalf of the Consolidated Group for tax years 2004 through 2007 showed an overpayment of taxes and each year VFG directed the IRS that said overpayment be applied to the following year's tax.  Ex. 21-24.

20.     In or around January 2009, VFG filed a Corporate Application for Quick Refund of Overpayment of Estimated Tax, requesting a tax refund of $5,000,016 on behalf of the Consolidated Group. Ex. 26.

21.     On February 9, 2009, a refund check in the amount of $4,995,015.66 was received by VFG.  AFT at ¶17.  The $5,000 reduction was due to a variance in an amount from a prior year tax amount.  Ex. 2.

22.     The refund proceeds of $4,995,015.66 were placed in a bank account controlled and owned by VFG.  Ex. D-6.  The bank account was at Venture Bank, and had the name "Venture Bank Financial Group," and bore account no. xxxxxx0310. Ex. D-6. (the "VFG Account").  It was not a trust account.  While the FDIC-R suggested that this account was not controlled by VFG, the testimony of Mr. Parsons and Mr. Arneson confirmed, and the Court finds, that this account was indeed owned by VFG at all times and the insertion of the word "Bank" in the name on the account was in error.   The name on the account was corrected to "Venture Financial Group" in June 2009.

23.      VFG allocated the proceeds of the $4,995,015.66 tax refund to the Bank and VWM in proportion to their losses.   Mr. Arneson's testimony illustrated this by going through

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7

the bank statements that showed the distributions. Ex. D-6. None of the members of the Consolidated Group objected to the allocation of the tax refund by VFG. AFT, ¶23.

24.     On April 23, 2009, VFG filed an Application for Tentative Refund requesting a second tax refund that adjusted the carryback of net operating losses sustained in 2008, applying them to 2006 and 2007 income. Ex. 30. On August 13, 2009, a second refund payment, related to this application, totaling $12,104,098 was received by VFG in the same VFG Account. *Id.* at ¶24.

25.     On that same day, the $12,104,098 tax refund was allocated by VFG to the members of the Consolidated Group on a pro-rata basis based on the taxable income or loss by entity. *Id.* at ¶¶27-28; Ex. D-6. The Bank was paid its portion, $10,927,171, and $30,262 was paid out to VWM, consistent with the 1993 TAA, with the balance retained by VFG.

**D.     The Bank's Closure and Placement in a Federal Receivership**

26.     On September 11, 2009, the State of Washington Department of Financial Institutions closed the Bank and placed the Bank into federal receivership. The FDIC-R was appointed as the receiver of the Bank.

27.     Following the appointment of FDIC-R as receiver for the Bank, VFG did not file an election to disassociate the Consolidated Group. *Id.* In September 2010, VFG, as agent for the Consolidated Group, filed the Consolidated Group's income tax return for the year 2009.

**E.     The FDIC-R's Request to Serve as Alternative Agent for the Consolidated Group and the FDIC-R Becomes Alternative Agent and Files Tax Returns**

28.     On July 26, 2011, the FDIC-R made a request to the IRS that the FDIC-R be granted status as an alternative agent for the Consolidated Group for federal tax purposes relating to the years in which losses for the members of the Consolidated Group occurred. Ex. D-11; AFT at ¶32.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8

29.     On August 5, 2011, the IRS authorized the FDIC-Receiver to act as alternative agent for the Consolidated Group under Treasury Regulation 26 C.F.R. 301.640-7. *Id.* at ¶32.

30.     In August 2011, the FDIC-R filed amended tax returns for tax years 2004 and 2005. *Id.* at ¶33. The FDIC-R sought a refund of $6,183,468 as a result of carrying back consolidated net operating losses reported from the 2009 tax year. *Id.*

31.     In May 2012, the FDIC-R, as alternative agent for the Consolidated Group, filed an amended tax return for 2009, requesting a refund of $610,000 (the amount of an estimated tax payment that had been made by VFG). *Id.* at ¶36.

32.     In September 2013, the FDIC-R, as alternative agent for the Consolidated Group, filed a second amended tax return for the tax year 2009, along with accompanying amended tax returns for 2005, 2006, and 2007, carrying back the losses to request refunds of taxes paid during those years. *Id.* at ¶38.

33.     The IRS accepted the FDIC-R's refund requests, as the Consolidated Group's alternative agent for the amended 2004 and 2005 returns (which requested, respectively, $3,328,533 and $2,854,935). *Id.* at ¶40.

### F.     The Tax Refunds Are Issued

34.     In July 2013, the IRS issued the tax refunds (which included interest) relating to the tax returns filed in August 2011 of $3,339,996.06 for the tax-year 2004 and $2,864,767.04 for tax year 2005, for a total refund of $6,204,763.10. (the "Prepetition Tax Refund"). AFT at ¶ 33. The FDIC-R negotiated the two checks for the Prepetition Tax Refunds on or about July 16, 2013.

35.     David Jones, an employee of the FDIC, testified that the IRS sent the FDIC-R a check written out to VFG, c/o the FDIC-R, on two occasions before they issued separate checks to the FDIC-R for 97% of the refund and to VFG for the remaining 3%. He explained that the FDIC-R sent the checks back to the IRS, each time instructing the IRS to make the checks for

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

the refund attributable to the Bank to the FDIC-R directly. Later, when the IRS issued the checks for the Postpetition Tax Refunds, 100% of the refunds went to the FDIC-R.

36.    In August 2011, the FDIC-R, holding 100% of the Prepetition Tax Refunds, sent VFG $164,485.79 for its portion of those refunds. *Id.* at ¶ 42. This was in conformance with the requirements of the 1993 TAA.

37.    In October 2014, the IRS paid a refund relating to the 2009 overpayment of estimated taxes in 2009 of $633,128 (the $610,000 estimated tax overpayment plus interest) to the FDIC-R, as the alternative agent of the Consolidated Group. *Id.* at ¶ 43.

38.    In November 2014, the IRS paid additional refunds to the FDIC-R, as agent for the Consolidated Group, in the amount of $1,634,091.15, accounting for the amended tax refunds for 2005, 2006 and 2007. *Id.* at ¶44.

39.    The total amount paid by the IRS to the Consolidated Group in October and November 2014 was $2,267,219.26 (the "Postpetition Tax Refunds"). *Id.* at ¶45. The Postpetition Tax Refunds were deposited in an escrow account pursuant to an agreement of the parties, subject to further order of this Court (the "Escrow Account"). Stipulated Order Authorizing Account Relating to Tax Refunds, *In re Venture Financial Group, Inc.*, No. 13-46392, ECF No. 98 (Bankr. W.D. Wash. Aug. 4, 2014).

40.    The total amount of the Prepetition and Postpetition Tax Refunds at issue in this case is $8,471,982.36 ($6,204,763 + $2,267,319.26). *Id.* at ¶51.

## G.    Venture Financial Group, Inc. Files for Bankruptcy Protection

41.    On October 10, 2013, VFG filed a voluntary petition for bankruptcy protection under Chapter 7 of the Bankruptcy Code (the "Petition Date"). *In re Venture Financial Group, Inc.*, 13-46392-BDL, ECF No. 1 (Bankr. W.D. Wash. Oct. 10, 2013).

42.    The Debtor's schedules at the time of filing showed $7,074,686.73 in assets and $39,434,126.84 in liabilities. *Id*. The schedules as filed also indicated an estimated $6,000,000

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10

in tax refunds as property of the estate. Ex. P-19. The Trustee has found no other assets, contingent or otherwise, to satisfy unsecured creditors. The Trustee offered unrebutted evidence that there would be over $25,000,000 in claims, and under $1,000,000 in assets, excluding the contingent claim concerning the Tax Refunds. The FDIC has not disputed that the Debtor was insolvent or that FDIC-R would be an unsecured creditor if the Court concludes that it is not the owner of the tax refunds.

43. The FDIC-R filed proof of claim no. 14 on April 8, 2014 as a general unsecured creditor, asserting its rights to the Prepetition and Postpetition Tax Refunds. *In re Venture Financial Group, Inc.*, 13-46392-BDL, Claim No. 14 (Bankr. W.D. Wash. Apr. 4, 2014). The proof of claim contained the following language:

> To the extent that the Trustee asserts claims to the tax refunds that have been received by the FDIC-R . . . and a court determines that the Debtor's bankruptcy estate owns such refunds, then the FDIC-R reserves the right to assert, and in such case does so assert, a claim against the Debtor's bankruptcy estate on account of such refunds.

*Id.*

## H.  VFG Did Not Waive or Abandon Its Rights Under the 1993 TAA

44. The FDIC-R asserted in its Trial Brief and at trial that VFG waived or abandoned any rights it had under the 1993 TAA by its statements or omissions. The FDIC-R points to several instances of conduct and statements by VFG which the FDIC-R believes demonstrates VFG's intentional relinquishment of its rights under the 1993 TAA.

45. The FDIC-R pointed to a statement made by Mr. Parsons during the appointment of the FDIC-R as agent for the Consolidated Group that VFG had no objection to the Bank's portion of a tax refund being paid by the IRS directly to the FDIC-R. In an August 5, 2011 letter to the IRS from Mr. Parsons on behalf of VFG, Mr. Parsons acknowledged:

> that the FDIC is the Receiver of Venture Bank, a former asset of Venture Financial Group. And, we plan to file our 2009 tax return which has a large refund due. Most of that refund will go to the FDIC as Receiver of Venture Bank, and we have no objection to their portion of the refund being paid directly to the FDIC.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 11

Ex. 53.    The FDIC-R argued that VFG's acquiescence to the Bank's direct receipt of the tax refunds was a departure from the 1993 TAA, which required the funds to be paid by the parent VFG to each member.  However, Mr. Parsons's August 5, 2011 letter also stated that "[t]o be clear, we vehemently disagree with the FDIC being our agent with the IRS."  VFG never agreed to FDIC-R taking over all responsibility for filing tax returns, nor did VFG's admission that FDIC-R would receive most of any refunds due to the Bank do anything other than acknowledge what the eventual outcome would be under the terms of the 1993 TAA.

46.    The FDIC-R also cited an e-mail from VFG's CFO Ms. Sager to VFG's accountants Moss Adams and Mr. Parsons dated December 30, 2009, in which Ms. Sager wrote that the FDIC would be entitled to losses attributable to the Bank.  Ex. 66.  In the e-mail, Ms. Sager wrote in response to the accountant's analysis that:

> [t]his looks like the FDIC is entitled of course to the losses attributable to the bank.  It doesn't look like they can get any refund related to the holding company.  Did you talk with the FDIC regarding Moss [Adams] filing the consolidated return and then returning the bank portion back to the FDIC?

This similarly just acknowledges what would happen as to any tax refund under the 1993 TAA.  In addition, Ms. Sager's statement appears to be more of a reflection of the information provided to her by Moss Adams rather than an affirmative statement that VFG intended to relinquish its rights under the 1993 TAA.

47.    In addition, FDIC-R noted that after the FDIC-R was appointed receiver for the Bank, VFG had the opportunity to file competing amended tax returns, in addition to the amended tax returns being filed by the FDIC-R.  However, VFG instead relied upon the tax returns filed by the FDIC-R.  The failure to file the same amendment does not indicate that VFG was abandoning any claim to the monies refunded.

48.    Lastly, the FDIC-R also pointed to an exchange between VFG's officers and the Federal Reserve Bank in October 2008.  On October 31, 2008, the Federal Reserve Bank of

San Francisco sent VFG a letter stating that following an examination of the Bank's assets that the condition of the Bank had deteriorated and was critically deficient. Ex. 33. Mr. Arneson, as President of VFG, responded to the Federal Reserve Bank of San Francisco stating that it was VFG's "intent to comply with the regulations outlined" in the Federal Reserve's letter. Ex. 34. As discussed below, none of these writings or omissions involving VFG exhibit an intent to relinquish its rights under the 1993 TAA.

## II.   Conclusions of Law

### A.  Jurisdictional Issues

#### 1.   *The Court's Statutory Authority and Venue*

The FDIC-R alleged in its Answer and Affirmative Defenses to Amended Complaint (the "Answer") that this Court lacks subject matter jurisdiction, that this matter is a non-core proceeding and stated that it does not consent to the entry of final orders or judgment by this Court. Answer, 2, March 16, 2016, ECF No. 100. The FDIC-R repeated its denial of its consent in its proposed Conclusions of Law." FDIC-R's Trial Br., Ex. B ¶3, July 12, 2016, ECF No. 102 ("[t]his is a non-core proceeding and the FDIC-Receiver has not consented to the entry of final orders or judgment by this Court").

This Court has jurisdiction over this case pursuant to 28 U.S.C. §1334(b) and 28 U.S.C. §§ 157(a), (b)(1), and (b)(2). Bankruptcy judges may hear and enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. §157(b)(1). "Core proceedings include, but are not limited to" sixteen different types of matters listed, which include  "matters concerning the administration of the estate," "allowance or disallowance of claims against the estate," "counterclaims by [a debtor's] estate against persons filing claims against the estate," "orders to turn over property of the estate," and "proceedings to determine, avoid or recover preferences." 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), and (F).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 13

The Court concludes that the Trustee's claims fall under all five of these categories of core proceedings, and that this Court has statutory authority to enter a final judgment in this case. The FDIC-R has filed a proof of claim in this case and thus the Trustee's claims fall under the categories of "matters concerning administration of the estate" and "allowance or disallowance of claims against the estate," and a "counterclaim." The Trustee's claims fall into categories under subsections (E) and (F) because the Trustee is also seeking an order to recover a preferential transfer (the Prepetition Tax Refund) and an order to turn over property of the estate being held in the Escrow Account (the Postpetition Tax Refund).

Venue is proper under 28 U.S.C. § 1409(a) because the Trustee's actions are related to a case under title 11 proceeding in this district.

### 2. The Court's Constitutional Authority to Enter a Final Judgment in this Case

In light of *Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594, 180 L. Ed.2d 475 (2011), the Court must consider, beyond statutory authority, whether it has constitutional authority to enter a final decision over the Trustee's two avoidance claims: the preference action to avoid the Prepetition Tax Refund and the postpetition avoidance claim to avoid the transfer of the Postpetition Tax Refunds. A central question to both of these avoidance claims is whether the Tax Refunds are property of the estate.

The Court holds that it has constitutional authority to render final decisions on the claims in this case because the FDIC-R has filed a proof of claim, bringing this case within the holdings of *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) and *Langenkamp v. Kulp*, 498 U.S. 42, 111 S.Ct. 330, 15 L.Ed. 2d 391 (1990). In *Stern v. Marshall*, the U.S. Supreme Court cited *Katchen* as an example where a bankruptcy court had the constitutional authority to determine the counterclaim when the creditor had filed a proof of claim, because "the same issue [arose] as part of the process of allowance and disallowance of claims." 564

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14

U.S. at 496 (citing *Katchen*, 382 U.S. at 333, n.9).  Approving of the bankruptcy court's exercise of power in that case, the *Stern* Court quoted *Katchen*: "he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure." *Id.*

In discussing *Langenkamp*, the *Stern* Court held that the bankruptcy court had power to determine a preference cause of action in a counterclaim to a proof of claim, "because then 'the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship'".  564 U.S. at 498 (citing *Langenkamp*, 498 U.S. at 44).   The key lesson from *Stern*'s analysis of *Katchen* and *Langenkamp* is that a bankruptcy court has constitutional authority to finally decide a counterclaim when the resolution of the counterclaim will be completely disposed of with the resolution of the creditor's proof of claim.  In *Stern*, the Supreme Court found the bankruptcy court lacked constitutional power when the debtor's counterclaim alleged claims that were beyond the scope of the creditor's proof of claim and were claims of a nature that required an Article III court adjudication (the counterclaims were common law tort claims).   *See Stern*, 564 U.S. at 496-498 ("in ruling on [the debtor's] counterclaim, the Bankruptcy Court was required to and did make several factual and legal determinations that were not 'disposed of in passing on objections' to Pierce's proof of claim for defamation. . . .").  Here, the Trustee's avoidance actions brought under Sections 547, 549, and 550 of 11 U.S.C. §§ 101, *et seq.*, to recover the Tax Refunds for the benefit of the estate are substantially identical to the claims alleged by the FDIC-R in proof of claim 14.  The Trustee is not asserting any counterclaims against the FDIC-R which lie outside of the FDIC-R's proof of claim, and the resolution of the FDIC-R's proof of claim will entirely dispose of the Trustee's claims, unlike in *Stern* v. *Marshall*.

Irrespective of the FDIC-R's proof of claim, the Court also concludes it has the constitutional power to determine whether the Tax Refunds constitute "property of the estate"

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 15

under 11 U.S.C. §541(a), which is the threshold issue of the Trustee's avoidance actions. *See Olivie Development Group LLC v. Ki Chang Park*, No. C11-1691Z, 2012 WL 1536207, at *3 (W.D. Wash. Apr. 30, 2012) (holding that "*Stern* did not hold that a bankruptcy judge lacks authority to enter judgment regarding what property is included in the estate."); *In re Salander-O'Reilly Galleries, LLC*, 475 B.R. 9, 29 (S.D.N.Y. 2012) ("the determination of what property constitutes the bankruptcy estate is a core proceeding, at least in this case and probably in most, if not all, cases.") (collecting cases); *see also Velo Holdings, Inc. v. Paymentech, LLC* (*In re Velo Holdings, Inc.*), 475 B.R. 367, 387–88 (Bankr. S.D.N.Y.2012) (collecting cases).

The issue of whether a tax refund is property of the estate is a non-*Stern* core issue. *In re BankUnited Financial Corporation*, 462 B.R. 885, 891 – 95 (Bankr. S.D.Fla. 2011) (rev'd on other grounds in *In re BankUnited Financial Corp.*, 727 F.3d 1100 (11th Cir. 2011)); *In re First National Bancshares, Inc.*, No. CA 7:12-3441, 2014 WL 108372, at *4 (D.S.C. Jan. 10, 2014)) ("determining what is an asset of a bankruptcy estate is a core proceeding for the bankruptcy court"). In *BankUnited*, the FDIC-R argued that determination of whether a tax refund was property of the estate was not a "core" matter following the *Stern v. Marshall* ruling. *Id.* at 892. The court in *BankUnited* found that property of the estate was an issue that stemmed from the bankruptcy because "the concept of what is property of a bankruptcy estate does not exist outside of a bankruptcy case." *Id.* at 894. The court dismissed the FDIC-R's argument that because "property of the estate" is determined by non-bankruptcy state law it should be resolved in a nonbankruptcy forum as "irrelevant since the issue of what is property of the estate is virtually always a matter of state law or other nonbankruptcy law." *Id. at* 93 (citing *In re Washington Mut., Inc.*, No. 08-12229, 2011 WL 4090757 (Bankr. D. Del., Sept. 13, 2011) (collecting pre-*Stern* cases holding that bankruptcy court had exclusive jurisdiction to determine whether disputed property was property of the estate.) The Court's focus in *BankUnited* was

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 16

that the Debtors' counterclaim matched the claim asserted in the FDIC-R's proof of claim squarely.

This Court agrees with the rationale in *BankUnited*.[4]  Determining whether a tax refund is "property of the estate" is ultimately a question posed under the Code, even though it may include consideration of various state and federal law issues.  Here, unlike in *Stern*, resolution of the Trustee's claims will fully resolve the FDIC-R's proof of claim no. 14.   Moreover, unlike *Stern*, the Trustee is not asserting a breach of contract claim to augment the estate or seeking damages under a contract for the recovery of the Tax Refunds.  His claims arise only in the context of a bankruptcy case under Sections 547, 549 and 550 of the Code to avoid transfers of the Tax Refunds and to recover them for the benefit of the estate, and involve a decision of the same issues implicated in the FDIC-R's proof of claim.  "The restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case."  *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 36, 109 S. Ct. 2782, 106 L.Ed.2d 26 (1989).

### 3.  *FIRREA Does Not Bar this Court's Jurisdiction*

The FDIC-R also challenges this Court's jurisdiction citing 12 U.S.C. §1821(d)(13)(D), which contains the administrative review exhaustion requirements under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").  However, the Ninth

---

[4] Three other courts have reached the opposite conclusion from *BankUnited*, albeit in the context of motions to withdraw the reference by the FDIC. *See In re Temecula Valley Bancorp, Inc.*, 523 B.R. 210 (C.D. Cal. 2014); *Siegel v. FDIC* (*In re IndyMac Bancorp, Inc.*), No. CV 11–03969, 2011 WL 2883012 (C.D.Cal. July 15, 2011); *In re Tamalpais*, 451 B.R. 6 (N.D. Cal., Mar. 21, 2011).  In *Tamalpais*, the Court concluded that "while a claim arising from a post-petition contract regarding the property of the bankruptcy estate is a core proceeding, a claim arising from a pre-petition contract is a non-core proceeding." 451 B.R. at 10-11 (citing *In re Harris*, 590 F.3d 730, 741–41 (9th Cir. 2009), and *In re Ray*, 624 F.3d 1124, 1131–33 (9th Cir. 2010)).  However, the Court finds all three of these cases distinguishable as none of them involved claims for preferences as in *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), and *Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (*per curiam*).  Here, there are statutorily core proceedings as preference claims are explicitly core proceedings under 11 USC 157(b)(2)(F), and actions to require turnover of estate property are core proceedings under 11 USC 157(b)(2)(E).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 17

Circuit has held that FIRREA's exhaustion requirement did not apply to actions filed in bankruptcy court to recover preferential transfers where the receiver has filed a proof of claim which matches the amount sought by the debtor. *In re Parker North American Corp.*, 24 F.3d 1145, 1155 (9th Cir. 1994); *see also McCarthy v. FDIC*, 348 F.3d 1075, 1077 (9th Cir. 2003) (affirming Parker's holding that FIRREA does not apply in the "special context of bankruptcy"). By filing a proof of claim, the FDIC-R rendered the administrative claims procedure futile. *See Parker*, 24 F.3d at fn. 12 ("When the [receiver corporation] makes a claim against others, it has in fact already engaged in the kind of administrative deliberative process that FIRREA was intended to provide for claims against it.") (internal quotations omitted). In concluding that the preference action in question was not susceptible of resolution through the claims procedure, the *Parker* court reasoned that FIRREA's administrative claims procedure applies only to claims of creditors against the receiver, and not to challenges incident to the receiver's claims against its debtors. *Id.* at 1152. The court supported this analysis of FIRREA with the policy concern that "Bankruptcy courts have expertise in determining preference actions, which involve legal matters unique to the Code. The [receiver corporation], on the other hand, has no special skill in determining bankruptcy questions and, in fact, would be under no obligation to apply bankruptcy law to a debtor's preference complaint." *Id.* at 1153.

Moreover, FIRREA's administrative claims exhaustion requirement is not invoked at the stage where the court is determining whether the *res* in question is an "asset" of the failed banking institution. *In re Vineyard Nat. Bancorp*, No. 2:10-BK-21661RN, 2013 WL 1867987, at *5 (Bankr. C.D. Cal. May 3, 2013) (citing *Parker*, 24 F.3d at 1153)). "[D]etermining the nature and extent of property of the estate is a fundamental function of a bankruptcy court .... [and] fundamental to the administration of a bankruptcy case." *Id.* at *6. (citing *In re Kincaid*, 917 F.2d 1162, 1165 (9th Cir. 1990).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 18

### 4. The D'Oench Duhme Doctrine Does Not Bar this Court's Jurisdiction

The FDIC-R also revived its previously addressed arguments that "this Court lacks jurisdiction over the Trustee's claims and that any alleged tax allocation agreement would be unenforceable pursuant to 12 U.S.C. § 1823(e) and the *D'Oench Duhme* doctrine." (FDIC-R's Trial Br., 12, July 12, 2016, ECF No. 102). 12 U.S.C. § 1823(e) generally is accepted as representing the codification of the rule from *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Section 1823 purports to bar any agreement "which tends to diminish or defeat" the interest of the FDIC in any asset unless the agreement is (A) in writing, (B) executed by the depository institution and the party claiming the adverse interest, (C) approved by the board of directors of the bank and (D) has been and continues to be an official record of the depository institution." This Court previously rejected FDIC-R's arguments based upon 28 U.S.C. §1823(e) and the *D'Oench Dume* Doctrine in its ruling on Defendant's Motion to Dismiss and in the Order on Defendant's Motion for Summary Judgment. (the "Summary Judgment Order"). Order on Mot. for Summ. J., 7, Nov. 5, 2015, ECF No. 80. The law of the case applies to foreclose this argument, and the FDIC-R has not raised any new arguments or cited to any new authority which demand a revision of the Court's previous ruling. *See generally U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) ("under the 'law of the case' doctrine, 'a court is generally precluded from reconsidering an issue that has already been decided by the same court'").

In this Court's Order on Motions for Summary Judgment, the Court noted that 12 U.S.C. §1823(e) only applies to "conventional loan" transactions, citing *In re IndyMac Bancorp, Inc.*, No. 2:08-BK-21752, 2012 WL 1037481, at *41 (Bankr. C.D. Cal. Mar. 29, 2012), report and recommendation adopted *sub nom. In re IndyMac Bancorp Inc.*, No. CV 12-02967-RGK, 2012 WL 1951474 (C.D. Cal. May 30, 2012), *aff'd sub nom. In re IndyMac Bancorp, Inc.*, 554 F. App'x 668 (9th Cir. 2014). Order on Mot. for Summ. J., 7, Nov. 5, 2015, ECF No. 80. In addition, this

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 19

Court noted that "Tax allocation agreements are not the sort of 'regular banking transaction' to which 12 U.S.C. § 1823(e) is intended to apply" because they are not one of the "secret agreements" at which the statute is aimed. *Id.* Thus, the *D'Oench Duhme* Doctrine is inapplicable in this case.

### B. The Tax Returns Are Property of the Estate

#### 1. *The Bob Richards Rule Does Not Apply As The 1993 TAA Establishes the Debtor's Right to Receive the Tax Refunds.*

We turn next to the issue of whether the Tax Refunds are property of the estate. In *W. Dealer Mgmt., Inc. v. England* (*In re Bob Richards Chrysler-Plymouth Corp., Inc.*), 473 F.2d 262 (9th Cir. 1973), the Ninth Circuit held that "[a]bsent any differing agreement, we feel that a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member." *Id.* at 265. The Ninth Circuit also noted that "where there is an explicit agreement, or where an agreement can fairly be implied, . . . the parties are free to adjust among themselves the ultimate tax liability." *Id.* at 264. The Court finds such an agreement exists in the 1993 TAA. Thus, the general rule in *Bob Richards* does not apply in this case. As discussed below, the 1993 TAA remained in effect up to the Petition Date, and throughout the bankruptcy process. By its terms, it is binding upon and inures to the benefit of any successor to the same extent as if the successor had been an original party to the agreement. The terms of the 1993 TAA govern the ownership of the Tax Refunds as the members of the Consolidated Group were operating under the 1993 TAA at all relevant times. And under its terms, the Prepetition Tax Refunds and Postpetition Tax Refunds belong to VFG and are therefore property of the estate.

In 2014, the Ninth Circuit upheld a decision under similar facts that tax refunds owed to a parent corporation under a similar tax allocation agreement were "property of the estate." *In*

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 20

*re Indymac Bancorp, Inc.*, 554 F. App'x 668, 670 (9th Cir. 2014).  The Ninth Circuit found that the tax sharing agreement adjusted the members' tax liability and described the process by which the parent corporation was to allocate tax refunds, if any, attributable to the bank's losses. *Id.*  Furthermore, the tax sharing agreement provided that the parent was to allocate the tax refunds attributable to any of the subsidiaries' losses.  *Id.*  The Court in *Indymac* held that the tax sharing agreement did not establish a principal-agent relationship because the Bank did not have the right to exercise control over the parent's activities under the tax sharing agreement. *Id.*  Finally, the Ninth Circuit held that the "TSA does not create a trust relationship" as there was no language creating a trust, which under California law resulted in a debtor-creditor relationship.  The Court distinguished the Eleventh Circuit's decision in *FDIC v. Zucker (In re NetBank, Inc.)*, 729 F.3d 1344 (11th Cir. 2013), because the tax allocation agreement in that case incorporated the Interagency Statement on Income Tax Allocation in Holding Company Structure from 1998 (the "1998 Interagency Statement")[5], whereas there was no such language in the agreement considered in *IndyMac*.  The conclusions that the Ninth Circuit reached in *IndyMac* are directly on point with this case.

Here, the 1993 TAA states that its "intent" was to establish a "method" for "reimbursing the Parent for payment of such tax liability," for "compensating any part [of the Affiliated Group] for use of its losses or tax credits", and "to provide for the allocation and payment of any refund arising from a carryback of losses or tax credits from subsequent taxable years."  Ex. 15. Paragraph 2(a) of the 1993 TAA requires each subsidiary of the Affiliated group to pay their tax

---

[5] The 1998 Interagency Statement recommended that "a parent company . . . obtains [tax refunds] as agent for the consolidated group. . . ." (emphasis added) As this Court noted in its Order on Motions for Summary Judgment, the 1998 Interagency Statement is not incorporated into the parties' 1993 TAA here (which was signed five years before the Interagency Statement was adopted) and the Interagency Statement is "non-binding" and legally "irrelevant" to adjudicating the ownership of the Tax Refunds. *In re IndyMac Bancorp, Inc.*, 2012 WL 1037481, at *39; *see also In re Vineyard Nat. Bancorp*, 508 B.R. 437, 446 (Bankr. C.D. Cal. 2014) ("nothing in the [Policy Statement] renders it legally binding or has the force of law").  In 2014, the Department of the Treasury issued an additional statement that parent companies were to hold tax refunds in trust for the consolidated group, but again these terms have not been incorporated into the tax allocation agreement analyzed here.

liability to VFG. *Id.* Paragraph 6 provides that any tax refunds received by the parent are to be paid out to the members of the Consolidated Group in their proportionate shares. *Id.*

The language of the 1993 TAA creates a debtor/creditor relationship, rather than a principal/agent relationship or a trust. Under the 1993 TAA, the Bank does not exercise any control over VFG's activities. Rather, Section 5 of the 1993 TAA gives VFG sole discretion to determine whether elections should be made to carry back net operation losses. "An agency relationship generally arises when two parties consent that one shall act under the control of the other." *Rho Co., Inc. v. Department of Revenue*, 113 Wash. 2d 561, 570, 782 P.2d 986 (1989); *In re Butler*, 512 B.R. 643, 654 (Bankr. W.D. Wash. 2014), *aff'd*, 550 B.R. 860 (W.D. Wash. 2015) (citing Restatement (Third) of Agency § 1.01 (2006) ("[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act")). Here, the 1993 TAA did not give the subsidiary members of the Consolidated Group any control over the parent's filing of the Consolidated Group tax returns or over how tax refunds would be handled.

Nor does the language of the 1993 TAA establish a trust for the Bank's benefit. Nothing in the 1993 TAA required VFG to hold funds either in trust for or for the benefit of the Bank. It instead speaks in terms of the subsidiaries "reimbursing" the parent for tax liabilities, and of the parent's "payment" of tax refunds. Sections 2(a) and (3) direct the subsidiary to make payments to the parent for their respective computed tax liability, and Sections (4) and (6) are framed as the parent making "reimbursements" and "payments" to the back to the subsidiaries in the case of any refunds or tax benefits. Terms such as "payment" and "reimbursement" are evocative of a creditor-debtor relationship. The absence of language creating a trust relationship is explicitly an indication of a debtor-creditor relationship under Washington law. *See Aebig v. Commercial Bank of Seattle*, 36 Wash. App. 477, 674 P.2d 696, 697 (Wash. Ct. App. 1984). Moreover, the

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 22

language of the 1993 TAA does not prohibit VFG from using the taxes collected or the refunds received for its own purposes; it is free to commingle the funds. VFG bears the risk of loss of the Tax Refunds, not the Bank.

The course of conduct between the parties further supports this interpretation of the 1993 TAA. Up until 2009, VFG directed how tax refunds would be treated. Prior to the closure of the Bank, VFG requested and received tax refunds relating to losses sustained by the members of the Consolidated Group in 2009. It deposited the refunds into a general account of VFG, calculated each member's share of the refunds, and reimbursed the members in accord with the 1993 TAA from that general account. The Bank had no direction or control over VFG in this process.

The Court concludes that the 1993 TAA governs the ownership of the tax refunds, rendering the *Bob Richards* rule inapplicable, and that the 1993 TAA established a creditor-debtor relationship between VFG and the Bank. Any tax refunds received were the property of VFG, and the Bank merely held a claim for payment against VFG for its share of the funds.

## 2. *VFG Did Not Abandon or Waive its Rights Under the 1993 TAA*

VFG and the other parties to the Consolidated Group did not abandon the tax allocation agreement at any time. The doctrine of abandonment provides that:

> The parties to an express contract may abandon it and are released from their contractual obligations if the conduct of one party is inconsistent with the continued existence of the contract and that conduct is known to and acquiesced in by the other party. . . . In order for rescission to be legally operative, all parties to the contract must consent to rescission by words or objective conduct.

*Modern Builders, Inc. of Tacoma v. Manke*, 27 Wash. App. 86, 615 P.2d 1332, review denied, 94 Wash.2d 1023 (1980); *Martinson v. Publishers Forest Products Co.*, 11 Wash. App. 42, 521 P.2d 233 (1974). Similarly, a waiver is the intentional and voluntary relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right. *Bainbridge*

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 23

*Island Police Guild v. City of Puyallup*, 172 Wash. 2d 398, 409–10, 259 P.3d 190, 195 (2011). The Washington Supreme Court has noted of waiver that:

> It may result from an express agreement or be inferred from circumstances indicating an intent to waive. It is a voluntary act which implies a choice, by the party, to dispense with something of value or to forego [sic] some advantage. The right, advantage, or benefit must exist at the time of the alleged waiver. The one against whom waiver is claimed must have actual or constructive knowledge of the existence of the right. He must intend to relinquish such right, advantage, or benefit; and his actions must be inconsistent with any other intention than to waive them.

*Id.* (citing *Bowman v. Webster,* 44 Wash.2d 667, 669, 269 P.2d 960 (1954)). As set forth *supra*, the FDIC-R sets forth a number of theories concerning the Debtor's alleged abandonment and waiver of the 1993 TAA but the Court concludes that none of these arguments are convincing.

First, as to the August 5, 2011 letter from Mr. Parsons acknowledging that most of the 2009 refund would go to the FDIC as Receiver of Venture Bank, and allowing the IRS to pay the Bank directly, the letter does not constitute a waiver because Mr. Parsons firmly objected to the FDIC-R acting as an agent of the Consolidated Group. The language does not exhibit an intent to abandon or waive VFG's rights to receive the Tax Refunds on behalf of the Consolidated Group under the TAA.

Second, as to the statement in the email from Ms. Sager to VFG's accountants that the FDIC would be entitled to losses attributable to the Bank, this fails to evidence an abandonment or waiver for several reasons: first, Ms. Sager is writing about her accountant's interpretation of the FDIC's rights, and second, there is no unequivocal abandonment of VFG's specific rights to the tax refunds. To the contrary, the e-mail suggests that Moss Adams, VFG's accountant, would file the tax return, and then VFG would "return[ ]. . . the bank portion back to the FDIC."

Third, as to VFG's alleged failure to file competing tax returns along with the FDIC-R, while VFG did not file the tax returns that ultimately resulted in the Tax Refunds at issue in this case, that was attributable to the FDIC-R's appointment as alternative agent for the Consolidated Group. Moreover, the 1993 TAA only required VFG to file a tax return; it did not

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 24

require VFG to file amended returns. VFG was not in breach of this provision because it did file initial tax returns for tax years 2004-2009. The 1993 TAA only described one responsibility of the parent company with regard to a tax refund: "in the case of a refund, the Parent shall make payment to each member for its share of the refund." Ex. 15 at ¶6. It was not necessary for VFG to file a duplicative tax return and it did not breach the 1993 TAA by failing to do so. Nor does VFG's inaction constitute a waiver or abandonment of the right to receive a tax refund on behalf of the Consolidated Group.

Fourth, the FDIC-R argued that VFG waived or abandoned its rights under the 1993 TAA when it agreed to comply with the terms of an October 31, 2008 letter from the Federal Reserve Bank of San Francisco, which stated that VFG was to act as a source of managerial and financial strength for the bank. (Ex. 33, p. 4). The FDIC-R pointed to Mr. Arneson's statement of intent to comply with the Federal Reserve's letter as a basis for waiver. (Ex. 34). However, this and other general pledges by Mr. Arneson do not amount to a specific waiver or abandonment of any of VFG's rights under the 1993 TAA and in fact Arneson's letter makes no reference to the 1993 TAA. The Court concludes that it does not amount to a waiver or abandonment.

### 3. *VFG's Ownership of the Tax Refunds Was Not Affected by the FDIC-R's Appointment*

The FDIC-R posited that the terms of the 1993 TAA do not apply to the Tax Refunds in this case because the FDIC-R, and not VFG, filed the tax returns that resulted in the Tax Refunds, and also received them from the IRS. However, the FDIC-R stepped into VFG's shoes under the 1993 TAA. In its letter to the IRS dated July 26, 2011 (Ex. D-11), the FDIC requested alternative agent status under Treas. Reg. §301.6402-7(c), noting that "the receiver can request and be granted agency status of a loss and carry-back year returns, so that it may, . . ., act as agent *for the group*." (emphasis supplied). Subsection (j) of that Treas. Reg. §301.6402-7 states that "this section . . . is not determinative of ownership of any such amount among current

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 25

or former members of a consolidated group (including the institution)." Other courts have disregarded the FDIC's appointment as an alternative agent and have instead looked at the tax allocation agreement in effect to determine the rights of the parties to the tax refunds in question. *In re Team Financials, Inc.*, No. 09-10925, 2010 WL 1730681, at *10 (Bankr. D. Kan. Apr. 27, 2010). The appointment of the FDIC-R as alternative agent and its subsequent acts in filing amended returns did not affect the ownership status as provided in the 1993 TAA or somehow alter or supersede the 1993 TAA.

### C. The Trustee Has Established the Elements of a Voidable Preference

The elements of a preference action are set forth in 11 U.S.C. §547(b):

. . . [T]he trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

* * *

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

#### 1. *There Was a Transfer of an Interest of the Debtor in Property for the Benefit of the FDIC-R.*

A transfer of an interest of the Debtor in property occurred when the FDIC-R negotiated the check from the IRS relating to the Prepetition Tax Refund. The term "transfer" has been

*FINDINGS OF FACT AND CONCLUSIONS OF LAW - 26*

granted a broad interpretation. *In re Huff*, No. ADV 12-05001-BTB, 2014 WL 904537, at *5 (B.A.P. 9th Cir. Mar. 10, 2014) (stating that the term "transfer" should be interpreted in its most comprehensive sense). The Bankruptcy Code itself defines "transfer" in § 101(54)(D) expansively: "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-(i) property; or (ii) an interest in property." For the purposes of payment by ordinary check, a "transfer" as defined by § 101(54) occurs on the date of honor, and not before. *Barnhill v. Johnson*, 503 U.S. 393, 400, 112 S. Ct. 1386, 1390, 118 L. Ed. 2d 39 (1992). The "transfer" of the Prepetition Tax Refund occurred when the check from the IRS was negotiated by the FDIC-R's bank on July 16, 2013 and honored shortly thereafter. Section 547(b) does not require the "transfer" to originate from the Debtor, but provides that "any transfer of an interest of the debtor in property" is subject to avoidance. As discussed in the previous section, the Prepetition Tax Refund was property of the estate, which is synonymous with "an interest of the Debtor in Property". *See Gladstone v. U.S. Bancorp,* 811 F.3d 1133, 1138 (9th Cir. 2016). The Prepetition Tax Refund was negotiated initially by the FDIC-R. Thus, the Trustee has shown that there was a transfer of an interest of the debtor in property for the benefit of the FDIC-R.

## 2. *The Transfer Was on Account of an Antecedent Debt*

The Code does not define the term "antecedent debt." However, a "debt" means liability on a "claim." 11 U.S.C. §101(12). A "claim" under the Code means:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 27

11 U.S.C. § 101(5). "Whether a debt is antecedent or current depends on when it was incurred." *Upstairs Gallery, Inc. v. Macklowe West Development Co. (In re Upstairs Gallery, Inc.)*, 167 B.R. 915, 918 (9th Cir. BAP 1994) (citations omitted). At the very latest, the Bank had a claim against VFG in August 2011, when the amended 2004 and 2005 tax returns were filed asserting the loss carrybacks from tax year 2009. At that time, VFG had a right of payment from the IRS, and the FDIC-R had a corresponding claim under the 1993 TAA.

Moreover, the Court believes that the Bank's claim arose even earlier than 2011. A claim for a tax refund arises at the end of the tax year to which it relates. *In re Wade Cook Fin. Corp.*, 375 B.R. 580, 596 (B.A.P. 9th Cir. 2007) (collecting cases). A claim for a loss carryback tax refund relates back to the tax years against which the carryback losses were applied. *See id.* at 598 (finding that a tax refund claim for carryback losses from 2002 related back to the 1997 and 1998 tax years); *see also Segal v. Rochelle*, 382 U.S. 375, 380, 86 S. Ct. 511, 515, 15 L. Ed. 2d 428 (1966) (finding a claim for a loss carryback tax refund a prepetition asset of the estate rather than postpetition asset because the claim was "sufficiently rooted in the pre-bankruptcy past"). VFG's claims to the tax refunds thus arose in the years to which the carryback losses were applied. The loss carrybacks from 2009 which resulted in the Prepetition Tax Refund carried back to tax years 2004 and 2005. As in *Wade Cook* and *Segal*, VFG's claim to the tax refunds, although contingent and unmatured, arose in the years against which the loss carrybacks from 2008 and 2009 were applied.

If VFG had a contingent, unmatured claim for a tax refund relating back to tax years 2004 and 2005, then the FDIC-R, as receiver for the Bank, had a corresponding contingent, unmatured claim for payment for its proportionate share of the Tax Refunds which related back to the tax years 2004 and 2005. The Bank had already satisfied its obligations under the 1993 TAA when it paid its calculated tax liabilities to VFG pursuant to Section 2(a) of the 1993 TAA for the tax years 2004 and 2005. The 1993 TAA required VFG to "make payment to each

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 28

member for its share of the refund." *See* Ex. 15, ¶6. VFG had a contractual obligation to pay the FDIC-R the portion of the Prepetition Tax Refund which was proportionate to the Bank's losses. Thus, the payments to FDIC-R as receiver for the Bank in July 2013 were on account of an antecedent debt owed under the 1993 TAA.

The FDIC-R disputes that there was an antecedent debt, claiming that VFG never treated prior tax refunds as a "debt" in its required financial reporting. In support of this assertion, the FDIC-R offered numerous financial reports which failed to reflect a debt relating to a tax refund owing from VFG to the Bank. For example, the FDIC-R pointed to a bank balance sheet dated March 31, 2009, which shows no receivables owing from VFG to the Bank. Ex. 17. The FDIC-R also cited financial reports that were required to be filed in 2009 that allegedly should have reflected a debt of $4.9 million from VFG to the Bank. However, the FDIC-R fails to account for the fact that, at the end of March 2009, the money had already been paid out from VFG to the Bank, and therefore no longer was a debt to be reported by VFG. Moreover, VFG and the Bank's transfer of the tax refunds from parent to subsidiary in 2009 demonstrates that they were still operating under the 1993 TAA. In both instances, the funds were initially deposited in an account owned by VFG and then later transferred out to the Bank.

### 3. *The Transfer Was Made within 90 Days of the Petition Date*

The Prepetition Tax Refund was received by the FDIC-R on July 12, 2013 and negotiated on July 16, 2013. The transfer occurred within 90 days of the Petition Date, October 10, 2013.

### 4. *The Transfer Was Made When VFG Was Insolvent*

VFG was insolvent as of the Petition Date. The testimony of Trustee Mark Waldron established that VFG's liabilities greatly exceeded its assets, as there were over $25,000,000 in claims against VFG and less than $15,000,000 in assets. The Trustee enjoys the presumption that, for purposes of avoiding a preferential transfer, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 29

the petition [in bankruptcy]." 11 U.S.C. § 547(f). It is the FDIC-R's burden to produce some evidence to rebut the presumption. *In re Koubourlis*, 869 F.2d 1319, 1322 (9th Cir. 1989). Here, the FDIC-R has not produced any evidence to rebut the presumption and thus, the court concludes that VFG was insolvent at the time of the transfer.

5. ***The FDIC-R Received More Than It Would Have Received in a Liquidation***

The Transfer enabled FDIC-R to receive more than it would have received in a chapter 7 case if the transfer had not been made. This Section requires the Court to construct a hypothetical chapter 7 case and determine what the creditor would have received if the case had proceeded under chapter 7. *In re LCO Enterprises*, 12 F.3d 938, 941 (9th Cir. 1993). Here, as the FDIC-R will be required to turn over the Tax Refunds to the Estate, the FDIC-R will have a wholly unsecured claim against the Estate in the amount of the Tax Refunds. The evidence showed that there were over $25,000,000 in claims, excluding any claim from the FDIC-R, and less than $1,000,000 in assets, excluding the Tax Refunds. Even assuming the addition of the Tax Refunds to the Estate, the FDIC-R would not receive 100% of its claim in a hypothetical liquidation. Therefore, the Trustee has satisfied this element of his preference action.

6. ***The Transfer of the Prepetition Tax Refund was Not a Contemporaneous Exchange for New Value***

The FDIC-R asserted in its Trial Brief that it had an affirmative defense of a contemporaneous exchange for new value given to the debtor under Section 547(c)(1) of the Code, however, the FDIC-R did not explain or support this argument in its Trial Brief or at trial. To satisfy the "contemporaneous exchange" defense to a preference action, the creditor must show that the transfer "was (a) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (b) in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1). The term "new value" is defined in Section 547 of the Code as:

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 30

"money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation."

11 U.S.C. § 547(a)(2).  The party asserting a contemporaneous exchange defense bears the burden of proving the nonavoidability of a transfer.  11 U.S.C. § 547(g).  Here, the FDIC-R cannot point to a contemporaneous exchange of new value.  The FDIC-R unilaterally undertook the responsibility of acting as an alternative agent for the Consolidated Group, against the protests of the Debtor.  It then filed the tax returns in August 2011 carrying back losses from the 2009 tax year which resulted in the Prepetition Tax Returns.  However, the Prepetition Tax Refunds were not paid out by the IRS until July 2013, at which time, the FDIC-R provided no value.  Rather, the FDIC-R orchestrated the bypass of VFG.  The "value" that was provided to the Consolidated Group was in the form of the estimated taxes paid by the Bank to the Consolidated Group during the tax years 2004 - 2009, and then later, the losses which occurred 2009, which were reported on the August 2011 tax return.  There was in no way a "contemporaneous exchange" for new value.  Thus, the FDIC-R has not met its burden of showing a contemporaneous exchange defense.

### D.  The Trustee's Objection to the FDIC-R's Proof of Claim No. 14

The second cause of action pled in the Trustee's Amended Complaint is captioned as an Objection to the FDIC-R's Proof of Claim, in that the Trustee denied that any of the tax refunds received or that may be received in the future are property of the FDIC-R, and the Trustee objected to FDIC-R retaining any tax refunds, current or future.  Although titled as an Objection to Claim, it in actuality seeks to disallow the claim if the FDIC-R unless and until the FDIC-R turns over the tax refunds.  Amended Complaint (1) to Recover Preferential Transfer, (2) Objecting to Claim, and (3) for Judgment on Stipulation (the "Amended Complaint"), 9-10, March 7, 2016, ECF No. 97.  Section 502(d) provides that:

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 31

"the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . .of this title or that is a transferee of a transfer avoidable under . . . 547, . . . 549, . . . , unless such entity or transferee has paid the amount, or turned over any such property, . . . ."

The Court concludes that Section 502(d) is applicable in this case, subject to the FDIC-R's turnover of the Tax Refunds. As the Court has previously concluded, the Tax Refunds are property of the estate and the FDIC-R must turn over the Tax Refunds to the Trustee. The Prepetition Tax Refund is currently in the possession of the FDIC-R. The turnover portion of the the Trustee's second cause of action is granted. The FDIC-R's Proof of Claim No. 14 will be allowed as a general unsecured claim, once the Tax Refunds have been received by the Trustee.

### E. The Trustee Is Entitled to Recover the Postpetition Tax Refund

The third cause of action in Trustee's Amended Complaint seeks the turnover of the Postpetition Tax Refund currently being held in the Escrow Account. Amended Complaint, 11, ECF No. 97. Although this cause of action was framed as a declaratory judgment action in the Trustee's Amended Complaint, the Trustee's Trial Brief characterizes this cause of action as recovery of a postpetition transfer. Trustee's Trial Br.,15, July 12, 2016, ECF No. 103. There, the Trustee states that the Postpetition Tax Refund is an avoidable transfer which is recoverable under 11 U.S.C. §§ 549 and 550. *Id.*

The Trustee is entitled to recover the Postpetition Tax Refund in the amount of $2,267,219.26 currently being held in the Escrow Account. Section 549(a) of the Code allows the Trustee to avoid a transfer of property of the estate that occurs after the commencement of the case, and Section 550(a)(1) permits a trustee to recover the amount of the avoidable transfer from the initial transferee. In October and November 2014, after the Petition Date, the IRS paid the Postpetition Tax Refunds to the FDIC-R, which received those funds and then later deposited them into the Escrow Account pending further order of this Court. *See* AFT, ¶¶43-

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 32

47.  As discussed above, this Court has found that the Postpetition Tax Refunds are property of the Estate, and the Trustee is entitled to recover them for the benefit of the Estate.

### F.  The Trustee Is Not Entitled to an Award of Attorney's Fees

The Trustee included in the prayer for relief of his Amended Complaint a request for attorneys' fees.  Amended Complaint, 13, March 7, 2016, ECF No. 97.  However, the Trustee failed to identify any contractual or statutory basis for an award of attorney's fees at trial or in his Trial Brief.  "The American rule denies attorney's fees to a litigant in federal court in the absence of contract, applicable statute, or other exceptional circumstances. . . ." *Richardson v. Alaska Airlines, Inc.*, 750 F.2d 763, 765 (9th Cir. 1984).  The 1993 TAA does not contain a fee-shifting provision.  Thus, the Court concludes that the Trustee is not entitled to an award of attorney's fees.

WHEREFORE, a Judgment will be entered in favor of Plaintiff Trustee, Mark D. Waldron and against the Defendant Federal Deposit Insurance Corporation, as receiver, conforming to the Court's rulings herein.

///End of Order///